**In re S & Z INTERNATIONAL MANAGEMENT, INC., a Fla. Corp., d/b/a Ponce De Leon Convalescent Center, Debtor.**

**FLORIDA NATIONAL BANK OF MIAMI, Plaintiff,**

**v.**

**Justin P. HAVEE, Trustee of S & Z International Management, Inc., a Fla. Corp., d/b/a Ponce De Leon Convalescent Center, Defendant.**

**United States of America, Intervenor.**

**Bankruptcy No. 80–00792–BKC–JAG.**
**Adv. No. 80–0318–BKC–JAG–A.**

United States Bankruptcy Court, S. D. Florida.

April 2, 1981.

Thomas L. David, c/o Gunn, Venney & Buhler, Miami, Fla., for plaintiff.

---

Barbara L. Phillips, c/o Phillips & Phillips, P.A., Miami, Fla., for trustee.

Clark D. Mervis, Asst. U. S. Atty., c/o Atlee W. Wampler, III, U. S. Atty., Miami, Fla., for United States of America.

Ileana M. Romeu, Tax Division, U. S. Dept. of Justice, Washington, D. C., for U. S.

Justin P. Havee, Trustee, Miami, Fla.

## FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

This adversary proceeding was tried on the complaint of Florida National Bank of Miami to determine the validity, priority and amount of lien and for turnover of funds, (C.P. No. 1) and on the trustee's answer (C.P. No. 4). The debtor-corporation operated a nursing home and plaintiff seeks funds received by the trustee from the State of Florida, Department of Health and Rehabilitative Services, as reimbursement for services performed prior to the filing of the bankruptcy, claiming a security interest in those funds.

The United States intervened, filing its Answer and Complaint in Intervention asserting the priority of certain tax liens over the security interest of Florida National Bank (C.P. No. 16). At trial the government conceded that its tax liens would be subordinate to the bank's security interest if it were valid and perfected, but joined the trustee in contesting the complaint. The amounts of the tax liens with their respective dates of tax assessments as set forth on Intervenor's Exhibits Nos. 1 and 2, admitted without objection and uncontroverted, are:

| | | |
|---|---|---|
| 3/17/80 | $ | 1,888.31 |
| 3/17/80 | $ | 28,152.72 |
| 12/10/79 | $ | 276.60 |
| 6/11/80 | $ | 37,752.70 |
| 6/11/80 | $ | 45,618.87 |
| Total | $ | 113,689.20 |

In its operation of the nursing home, the debtor entered into a loan agreement with the bank on January 13, 1978, obtaining a $100,000 line of credit (Plaintiff's Exhibit No. 1). At that time a security agreement was executed, giving the bank a security interest in existing and future accounts receivable and contract rights, and all proceeds thereof (Plaintiff's Exhibit No. 4). A UCC financing statement was filed on January 20, 1978 (Plaintiff's Composite Exhibit No. 5). The financing statement covered "accounts receivable and contract rights now existing or hereafter acquired" but the proceeds coverage box was not checked off. On March 30, 1978, the line of credit under the same security agreement and financing statement was increased to $175,000 (Plaintiff's Exhibit No. 2). A series of advances and repayments were made over a period of approximately two and one-half years, with the last advance having been made by the bank on August 7, 1979 (Plaintiff's Composite Exhibit No. 7).

On June 30, 1980, plaintiff and two other creditors filed an involuntary bankruptcy petition against the debtor. An interim trustee was appointed on July 2, 1980, and the order for relief was entered on August 25, 1980. The outstanding balance of the debt on June 30, 1980 was $130,000.

After the involuntary petition was filed, the nursing home continued to be operated by the trustee for a short period of time before termination of his operation of the home. In July and August, 1980, the trustee received checks from the State of Florida, Department of Health and Rehabilitative Services, as reimbursement for services provided to Medicaid patients both before and after the petition was filed. However, services of a value in excess of $130,000 had been rendered prior to the filing of the petition, and accounts receivable for that amount existed on the date of filing. The bank had never required that the debtor deposit its Medicaid reimbursements in a separate cash collateral account, and the trustee deposited the funds he received in a general operating account for the nursing home.

During this proceeding, the plaintiff bank elected to have $30,000 of its debt in the principal amount of $130,000 treated as unsecured. The parties stipulated that an

interest computation on the $100,000 and plaintiff's application for attorneys' fees, would be jointly submitted after trial. In this action, plaintiff asserts that its security interest covers all Medicaid reimbursement funds received by the trustee for services rendered prior to the filing of the petition, and it seeks a return of those funds to the extent of its debt, including the principal amount, interest and attorneys' fees.

Defendant asserts 11 U.S.C. § 552 as a defense to the validity of plaintiff's security interest as applied to the Medicaid funds received by the trustee. Section 552 provides, in pertinent part:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) ... if the debtor and a secured party enter into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds ... of such property, then such security interest extends to such proceeds ... acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

Article 9 of the Uniform Commercial Code permits creditors to take security interests in "after-acquired property", that is, property acquired by the debtor after creation of the debt which is secured by such collateral. The legislative history of the Bankruptcy Code demonstrates that the purpose of § 552 is to prevent the attachment, under such a clause, of a creditor's pre-petition security interest to entirely new property acquired by the estate or by the debtor in bankruptcy. (House Report No. 95–595, 95th Cong., 1st Sess. (1977) 376–377; Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 91, U.S.Code Cong. & Admin.News 1978, p. 5787.) Had the bank, as permitted by its security agreement, asserted a security interest in accounts receivable which accrued while the trustee operated the nursing home, those accounts would have fallen squarely within the intended Congressional prohibition of § 522(a).

"Proceeds" under the UCC are a particular type of collateral, and are not to be confused with after-acquired property. The distinction is preserved by § 552(b), which excepts proceeds from the effect of § 552(a). Subsection (b) is consistent with the overall treatment of security interests under the Bankruptcy Code. It essentially retains the priorities in proceeds as set forth in the UCC, even for proceeds which were received after commencement of the case.[1]

■ At the time the debtor and Florida National Bank executed their security agreement the term "proceeds" was defined to include "whatever is received when collateral or proceeds is sold, exchanged, *collected* or otherwise disposed of". Fla.Stats. § 679.306(1) (1978) (emphasis added). The checks received by the trustee for Medicaid reimbursement were in collection of the bank's accounts receivable collateral, and were thus proceeds, and subject to § 522(b).[2] *Barnett Bank of Pensacola v. Fletcher*, 290 So.2d 533 (Fla. 1st D.C.A. 1974).

---

1. Subsection 552(b), does provide that the court, "based on the equities of the case", may order "otherwise", but the legislative history indicates that this is to make provision for an increase in the value of collateral created by the estate at the estate's expense, and which thus depletes the fund available for general unsecured creditors.

2. House Report No. 95–595 states that "proceeds" in § 552 of the Bankruptcy Code is not limited to the UCC definition of proceeds but includes any property into which property subject to the security interest is converted. However, the checks received by the trustee here do fall within the narrower UCC definition.

The parties do not dispute that under applicable nonbankruptcy law, (as mandated by § 552(b)) a valid, but unperfected, security interest is subordinate to the rights of a trustee or a lien creditor in the collateral. Fla.Stats. § 679.301. The issue here, then, is whether the bank's security interest in these proceeds was perfected.[3] The court holds that under Florida law the security interest was not perfected.

Fla.Stats. § 679.306(3) governs perfection for proceeds. Under the 1962 version of the Uniform Commercial Code, if a security interest in the original collateral was properly perfected, a secured creditor nevertheless was required to file a financing statement specifically covering proceeds, or perfect its security interest in proceeds within ten days of their receipt by the debtor. Under the 1972 version, where a secured creditor has perfected its security interest in the original collateral the proceeds are automatically perfected, with certain exceptions not applicable here. The Florida National Bank had perfected its security interest in the accounts receivable by filing a financing statement, but did not file a financing statement covering proceeds, and did not perfect its security interest in proceeds within ten days of their receipt by the trustee. Thus, if the 1962 version is applicable, the bank's security interest in the Medicaid funds *is not* perfected, while its security interest *is* perfected if the 1972 draft applies.

Florida had adopted the 1962 Uniform Commercial Code, and that version of Fla. Stats. § 679.306(3) was in effect at the time the security agreement was entered into between the debtor and the bank. In 1979 the Florida legislature made amendments to the Florida UCC, essentially adopting the 1972 uniform act. The effective date of the Florida amendments was January 1, 1980. All payments and disbursements under the loan secured by the accounts receivable occurred prior to January 1, 1980; only the petition in bankruptcy and this adversary proceeding to determine validity and priority of the bank's lien occurred after that date.

Along with the 1972 substantive amendments, Florida adopted most of the UCC transition provisions set forth in Chapter 11 of the official draft.[4] The most comprehensive transition provision is Fla.Stats. § 680.-101(2), corresponding to the uniform act § 11–103. It provides:

> Transactions validly entered into ... before the effective date of this act ... and the rights, duties, and interests flowing from such transactions remain valid after [the effective date] and may be terminated, completed, consummated, or enforced as required or permitted by this act....

The effect of this transition provision is distinctly different from the prior version, (applicable to the transition from pre-UCC to UCC law,) which provided that the *earlier* law would generally control. However, on the face of this section, it is not apparent that it operates to make the new law applicable for § 679.306(3). Other transition sections deal more particularly with security interests which were perfected under the old statute, but would not be perfected under the new, but no section deals with the reverse situation, as created by the amendment to § 679.306(3).

There is no accessible legislative report or commentary to assist in interpreting or gauging the breadth of § 680.101(2), and the rules of UCC construction of § 671.102 are not particularly helpful in interpreting this transition provision. Examining the general terms used in the section, it first appears that the bank's action is one to "enforce" its rights, and is thus covered by the section. But the section preliminarily

---

3. Fla.Stats. § 679.306(4) limits the extent of an otherwise perfected security interest in proceeds, following insolvency. Because of the conclusion reached by this court on the preliminary issue of perfection, it is not necessary to apply § 679.306(4).

4. Provisions for the transition from prior state law to the UCC were included in Chapter 10 of the uniform act. Those provisions were adopted in Fla.Stats., Chapter 680. The UCC Chapter 11 provisions were then added to Chapter 680, and prior inconsistent sections were either repealed or amended.

refers to transactions "validly entered into" and the "rights, duties, and interests flowing from such transactions". Since the bank's security interest in proceeds was not perfected under the old law, no rights arose for it to enforce under the new one. The amendment to § 679.306(3) effects great changes in the substantive rights of the parties, and such changes should not be merely inferred. But of most significance is the fact that § 11–104 of the uniform act, covering this precise situation, was *not* enacted by the Florida legislature. Section 11–104 provides:

> A security interest for the perfection of which filing or the taking of possession was required under [old UCC] and which attached prior to the effective date of [new UCC] but was not perfected shall be deemed perfected on the effective date of [new UCC] if [new UCC] permits perfection without filing or authorizes filing in the office or offices where a prior ineffective filing was made.

This is the only provision of UCC Chapter 11 which was entirely omitted from the Florida amendments to Chapter 680, and it must therefore be assumed that it was the intention of the legislature *not* to automatically perfect (upon the effective date of the amendments) unperfected pre-amendment security interests in proceeds.

It should be noted that Fla.Stats. § 680.-111, (UCC § 11–108) creates a presumption that the amendments to the UCC are merely declaratory of prior law unless a change in law has clearly been made. A comment in the Sponsors' Notes to the 1979 amendment of § 679.306 raises a false question of whether the amendment might not have been merely declaratory. The pertinent paragraph states:

> Subsection (3) is amended to clarify that a secured party's right to proceeds is automatic unless otherwise agreed. There are certain limitations, however. Specifically, where the filing as to the original collateral is an inappropriate means of perfection as to the proceeds or is made at a place that is inappropriate as to the proceeds, perfection as to the original collateral perfects an interest in the pro-

ceeds for only 10 days. Cross-hatching the "proceeds" box on UCC–1's will not, therefore, be dispositive of the secured party's rights in the proceeds.

If the phrase "right to proceeds" in this Note refers to *perfection* rather than *creation* of a security interest, as it appears to do, the Note is simply wrong. The amendment to § 679.306(3) could not "clarify" that a secured party's right to proceeds is "automatic". Whatever the sponsor's belief as to the state of Florida law in 1979, the section to be amended showed on its face that a secured party's right to proceeds was *not* automatic. Case law in Florida, as well as other states, has so held.. *Barnett Bank of Tallahassee v. Applegate*, 379 So.2d 1284 (Fla. 1st D.C.A. 1979). See also the reporter's notes to the official text of the UCC, demonstrating such to be the intention of the drafters of the uniform act. The underlying purpose of making the law uniform among the various jurisdictions, codified by Florida in Fla.Stats. § 671.102(2)(c), also supports the position that perfection of proceeds under the prior Florida law was not automatic beyond ten days.

The language and tone of the quoted section of the Florida Sponsor's Note echoes a reporter's note to the uniform act which shows reasons for each change made by the drafters of the 1972 version of the UCC. The uniform act comment, however, refers to *creation* of a security interest, not *perfection*. As set forth in the appendix to the official text of the 1972 Uniform Commercial Code it states:

> Heretofore an apparent inconsistency and ambiguity has existed between the last sentence of Section 9–203(1)(b) of the 1962 Code, which indicated that a claim to proceeds had to be an express term of a security agreement, and Section 9–306(2), which indicated that a right to proceeds was automatic without reference to a term of a security agreement. This ambiguity has been clarified in favor of an automatic right to proceeds, on the theory that this is the intent of the parties, unless otherwise agreed.

Confusion may have arisen because of the ambiguity of the phrase "right to proceeds". The phrase could refer to the right of a secured creditor vis-a-vis the debtor, (*creation* of a security interest,) as used in the official comment, or to the right of a secured creditor vis-a-vis other lien creditors, (*perfection* and priority of the security interest,) as apparently intended in the Florida Sponsor's Note. In the Florida UCC as well as the 1962 uniform version there was indeed an apparent inconsistency regarding the *creation* of a security interest in proceeds which *was* "clarified" by the amendments adopted in 1979. There was no lack of clarity regarding *perfection* under the prior Florida law, however. The bank here, of course, had identified proceeds as collateral in its security agreement, and had failed only to include proceeds on the financing statement, as was necessary for *perfection* prior to the amendments.

Thus, the 1979 amendment to § 679.306(3) was not merely declaratory of prior law. Under the Florida statutes as they existed at the time of the transactions in this case the bank's security interest in the payments received by the trustee from the State of Florida was not perfected, and the new provisions, according to which that security interest would be perfected, are not applicable. The bank therefore lacks priority, and there is no basis for the trustee to turn over to the bank those funds. The bank will be treated as an unsecured creditor for the full amount of its claim.

As required by Bankruptcy Rule 921(a), a separate Judgment incorporating these Findings and Conclusions is being entered this date.